Joseph G. Sansone
Preethi Krishnamurthy
Lindsay S. Moilanen
Sushila Rao Pentapati
Joshua R. Geller
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0410 (Rao Pentapati)
Email:  pentapatisu@sec.gov

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br><br>                              **Plaintiff,**<br><br>          -against-<br><br>ANDRE WONG,<br><br>                              **Defendant.** | **COMPLAINT**<br><br>1:24-cv-04231 (      )<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Securities and Exchange Commission ("SEC"), for its Complaint against Defendant Andre Wong ("Wong"), alleges as follows:

### SUMMARY

1. Wong unlawfully used inside information to trade the securities of NeoPhotonics Corporation ("NeoPhotonics") ahead of an announcement by his employer, Lumentum Holdings Inc. ("Lumentum"), of its agreement to acquire NeoPhotonics.

2. At the time, Wong was a vice president of product line management at Lumentum, a designer and manufacturer of photonics products, *i.e.*, devices and systems that

1

generate, manipulate, or detect light. Wong obtained material nonpublic information about Lumentum's confidential plans to acquire NeoPhotonics, another company in the photonics industry, from his colleague and close friend at Lumentum ("Colleague 1"), who was assigned to help with due diligence on the deal.

3. On October 28, 2021, on the basis of that information, Wong purchased 10,000 shares of NeoPhotonics.

4. Before October 28, 2021, Wong had never traded NeoPhotonics securities—or the securities of *any* other company in the more than $100 billion United States photonics market, except for his employer Lumentum.

5. Following Lumentum's announcement of its acquisition on November 4, 2021, NeoPhotonics's stock price rose by approximately 39%, and Wong's NeoPhotonics stock was worth $62,500 more than when he had bought the stock, measured by the closing price of the shares that day.

6. In 2022, after being confronted about his NeoPhotonics trading by agents of the Federal Bureau of Investigation ("FBI"), Wong sought to conceal the illegal nature of his trading. He denied his awareness of Lumentum's plans to acquire NeoPhotonics to the FBI agents and created false texts to conceal his in-person meeting with Colleague 1 soon after the FBI agents had approached him.

## **VIOLATIONS**

7. By virtue of the foregoing conduct and as alleged further herein, Wong violated Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

8. Unless Defendant is restrained and enjoined, he will engage in the acts, practices, transactions, and courses of business set forth in this Complaint or in acts, practices, transactions, and courses of business of similar type and object.

## NATURE OF THE PROCEEDINGS AND RELIEF SOUGHT

9. The Commission brings this action pursuant to the authority conferred upon it by Exchange Act Sections 21(d) [15 U.S.C. § 78u(d)] and 21A(a) [15 U.S.C. § 78u-1(a)].

10. The Commission seeks a final judgment: (a) permanently enjoining Wong from violating the federal securities laws and rules this Complaint alleges he has violated; (b) ordering Wong to disgorge any ill-gotten gains he received as a result of the violations alleged here and to pay prejudgment interest thereon pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) & 78u(d)(7)]; (c) ordering Wong to pay civil money penalties pursuant to Exchange Act Section 21A [15 U.S.C. § 78u-1]; (d) prohibiting Wong from serving as an officer or director of any company that has a class of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and (e) ordering any other and further relief the Court may deem just and proper.

## JURISDICTION AND VENUE

11. This Court has jurisdiction over this action pursuant to Exchange Act Section 27 [15 U.S.C. § 78aa].

12. Wong, directly and indirectly, has made use of the means or instrumentalities of interstate commerce or of the mails in connection with the transactions, acts, practices, and courses of business alleged herein.

13. Venue lies in this District under Exchange Act Section 27(a) [15 U.S.C. § 78aa(a)]. Certain of the acts, practices, transactions, and courses of business alleged in this Complaint occurred within this District, including execution and clearing of the relevant securities transaction through a broker-dealer located in this District, and involve securities listed on a stock exchange located within this District.

## DEFENDANT

14. **Wong**, age 53, resides in San Jose, California, and was employed by Lumentum or its predecessor entity from November 2000 until December 2022.

## RELEVANT ENTITIES

15. **Lumentum** is a Delaware-incorporated provider of optical and photonic products that is headquartered in San Jose, California. Lumentum's common stock is listed on the NASDAQ Global Select Market stock exchange and trades under the symbol "LITE."

16. From at least October 2018 until approximately August 2022, **NeoPhotonics** was a Delaware-incorporated developer of silicon photonics and advanced hybrid photonic integrated circuit-based lasers, modules, and subsystems for communications networks, and was headquartered in San Jose, California. Until NeoPhotonics's delisting in August 2022 following its acquisition by Lumentum, NeoPhotonics was an SEC-reporting issuer whose common stock was listed on the New York Stock Exchange and traded under the symbol "NPTN." Prior to its acquisition, NeoPhotonics was a key competitor of Lumentum in the communications sector of the photonics industry.

# FACTS

**I.  Background:  Wong's and Colleague 1's Roles at Lumentum**

17. Wong began working at Lumentum in August 2015.

18. Prior to August 2015, Wong was an employee of JDS Uniphase Corporation ("JDSU"), Lumentum's predecessor entity.

19. From at least October 2018 through December 9, 2022 (the "Relevant Period"), Wong was employed, through a wholly-owned indirect subsidiary of Lumentum, as a vice president at Lumentum.

20. Between October 2018 and June 2022, Wong was a vice president of product line management for 3-D sensing at Lumentum.

21. Between June and December 2022, Wong was a vice president for strategic marketing at Lumentum.

22. During the Relevant Period, Colleague 1 was a product line manager for Lumentum's telecom transport business.

23. In this role, Colleague 1's product line at Lumentum directly overlapped and competed with NeoPhotonics's products.

**II.  Background:  Wong and Colleague 1's Friendship**

24. By 2021, Wong and Colleague 1 had been colleagues at Lumentum and its predecessor entity for approximately 20 years.

25. For several years prior to the Relevant Period, Wong and Colleague 1 had reported to the same manager.

26. During the Relevant Period, as product line managers for similar products, Wong and Colleague 1 were peers.

27. During the Relevant Period, Wong and Colleague 1 had regular "one-on-one" meetings to sync up on key developments in their business units.

28. Wong was aware that Colleague 1 was an internal subject-matter expert on the Lumentum business line that competed with NeoPhotonics's products.

29. As Wong has testified, he therefore understood that Colleague 1 would know about and be involved in any potential plan by Lumentum to acquire NeoPhotonics.

30. Wong and Colleague 1 communicated regularly via phone calls, texts, and emails.

31. In addition, as Wong has testified, Colleague 1 was one of Wong's "good friends."

32. Wong and Colleague 1 regularly had dinners together, and discussed their families and personal lives.

33. In 2021, when Lumentum's offices were closed due to the COVID-19 pandemic, Wong and Colleague 1 had dinner together on multiple occasions.

### III.  Lumentum's Policies Prohibiting Insider Trading

34. Throughout the Relevant Period, Colleague 1 and Wong knew they were subject to Lumentum's policies and procedures, including policies relating to insider trading and safeguarding material nonpublic information described below in Sections III.A and III.B.

35. As Wong has testified, he was aware that information about potential mergers or acquisitions would be considered material while he was working at Lumentum.

### A.  Lumentum's 2019 Code of Business Conduct

36. Lumentum's Code of Business Conduct, dated November 2019, expressly applied to "all directors, employees, agents and contractors" of Lumentum during the Relevant Period.

37. The Code of Business Conduct contained a section entitled "Respecting privacy and confidentiality." This section provided (with emphasis added):

> You must maintain the confidentiality of information entrusted to you by Lumentum. . . . Confidential information includes all non-public information. . . . Examples of confidential information include . . . information about potential acquisitions. . . . You must not disclose . . . confidential information about Lumentum . . . to anyone who is not authorized to receive it or has no need to know the information **(even other Lumentum employees)**.

38. This section of the Code of Business Conduct also included the following question-and-answer section:

> Q: I know that Lumentum is about to acquire a small company with interesting product offerings that a current customer I am talking to might want to hear about. Can I discuss the imminent acquisition in order to lay the foundation for future sales?
>
> A: No. This is Lumentum confidential information that should not be disclosed unless you have received authorization from the [ ] legal department or until the acquisition has been completed and publicly announced.

39. The Code of Business Conduct also contained a section entitled "Insider Trading." This section stated:

> You should never trade securities on the basis of confidential information acquired through your employment . . . with Lumentum. . . . You must . . . refrain from trading in the stock of other publicly held companies, such as existing or potential customers or suppliers, on the basis of material confidential information obtained in the course of your employment. . . . It is also illegal to recommend a stock to (i.e., 'tip') someone else on the basis of such information.

40. Lumentum provided online annual training on its Code of Business Conduct to all employees, including Colleague 1 and Wong.

41. On April 28, 2021, Colleague 1 completed the annual training on the Lumentum Code of Business Conduct.

42. On May 10, 2021, Wong completed the annual training on the Lumentum Code of Business Conduct.

43. The 2021 annual training on the Code of Business Conduct explained that inside information is both nonpublic and material and could include nonpublic information about "upcoming mergers or acquisitions."

44. The 2021 annual training elaborated:

> Inside information is any material, nonpublic information that you come across as a result of your job – which means it does not have to be about our organization. It can include material, nonpublic information you learn about through relationships with vendors, suppliers, clients and other third parties you interact with in the course of your work.

**B.     Lumentum's Fiscal Year 2022 ("FY22") Confidentiality Acknowledgement**

45. Lumentum required its employees to complete a "Confidentiality Acknowledgement" on a regular basis.

46. Lumentum's Confidentiality Acknowledgment defined "Lumentum" to include all affiliate and subsidiary companies owned or controlled by Lumentum.

47. On July 26, 2021, Colleague 1 completed Lumentum's FY22 Confidentiality Acknowledgement.

48. On July 29, 2021, Wong completed Lumentum's FY22 Confidentiality Acknowledgement.

49. The FY22 Confidentiality Acknowledgment began as follows: "While at Lumentum, I may have access to confidential and proprietary information about the company, its employees, customers, suppliers, partners, or other parties (all such confidential and proprietary information being referred to as 'Confidential Information' [in this Acknowledgment])."

50. The FY22 Confidentiality Acknowledgement included, in relevant part, the following affirmations:

> I know that Confidential Information includes any non-public information, whether related to Lumentum, its customers, suppliers or its employees. Inventions, trade secrets, information about potential acquisitions, financial information, customer product information, supplier manufacturing processes, and employee information are just some of the many examples of information which must be kept confidential.
>
> I must not directly or indirectly disclose Confidential Information to anyone who is not authorized to receive it or has no 'need to know' the information (including other Lumentum employees).  As an employee of Lumentum, I have a duty to hold all such Confidential Information in strict confidence.
>
> . . .
>
> I acknowledge that I have a duty to maintain Confidential Information in strict confidence, and that I will abide by my employment/engagement agreement with Lumentum respecting confidentiality, and will adhere to Lumentum's confidentiality and proprietary information policies and procedures, including the relevant sections of Lumentum's Code of Business Conduct.

### IV.     Lumentum and NeoPhotonics Begin Discussing a Potential Acquisition

51.     Lumentum and NeoPhotonics first discussed a potential acquisition of NeoPhotonics by Lumentum in September 2020, overlapping with Lumentum's parallel negotiations with another potential target company.

52.     Lumentum took steps to protect the confidentiality of this potential transaction, including, for example, by using the code name "Project Neptune" for its potential acquisition of NeoPhotonics, and instructing employees not to forward Project Neptune meeting invitations.

53.     In or around November 2020, Colleague 1 began participating in Lumentum's due diligence concerning its acquisition discussions with NeoPhotonics.

54.     Colleague 1 was entrusted with a shared digital document folder and data room containing Project Neptune deal-related information.

55.     Colleague 1 also attended Project Neptune due diligence meetings with NeoPhotonics employees.

56. In or around January 2021, Lumentum's discussions to acquire NeoPhotonics were suspended to enable Lumentum to prioritize negotiations with the other potential target.

57. In March 2021, Lumentum and the other potential target terminated their negotiations.

## V. Lumentum and NeoPhotonics Resume Negotiations and Strike a Deal

58. On June 1, 2021, Lumentum contacted NeoPhotonics to determine whether NeoPhotonics would be interested in resuming its acquisition discussions with Lumentum.

59. Between June and September 2021, Lumentum and NeoPhotonics exchanged several offers and counteroffers.

60. On September 30, 2021, Lumentum offered to acquire NeoPhotonics for $16.00 per share.

61. On October 5, 2021, NeoPhotonics's Board of Directors voted to accept Lumentum's September 30 offer.

62. From October 10 to November 3, 2021, Lumentum and NeoPhotonics negotiated the terms of the acquisition agreement and engaged in due diligence discussions.

## VI. Wong Initially Tries to Obtain Confidential Information About a Lumentum Acquisition But Does Not Succeed

63. Beginning by at least August 2021, Wong began seeking information from colleagues about a potential acquisition by Lumentum, including as alleged below.

64. On August 31, 2021, Wong texted a Lumentum colleague who was responsible for Lumentum's California laser fabrication plant ("Colleague 2") about an upcoming "all hands" meeting, and whether it related to an acquisition:

> Wong: We have an all hands meeting on [September] 13. Any thoughts?
> Colleague 2: I don't know. I was thinking about that.
> Wong: Must be acquisition?
> Colleague 2: We will find out in next director meeting.

65. On the same day, Wong texted a Lumentum colleague who worked in the company's finance department ("Colleague 3"), again seeking information about whether the upcoming meeting related to acquisition activity:

> Wong: What's the rumor on the all hands? Reorg[anization] or acquisition?
> Colleague 3: I'm trying to get that info.

66. The next day, September 1, 2021, Wong continued to pry for details from Colleague 3:

> Wong: Have u heard anything?
> Colleague 3: No[,] you know my source and she is getting the Heisman.

67. As Wong has testified, he knew that Colleague 3's "source" was Colleague 3's supervisor at Lumentum.

68. As Wong has also testified, he understood "getting the Heisman" in this context to mean that Colleague 3's supervisor's efforts to obtain information about Lumentum's planned acquisitions were being rebuffed.

69. On September 2, 2021, Colleague 3 reported back to Wong:

> Colleague 3: Still radio silence.
> Wong: Ok thanks! Let's keep digging[.]

70. On October 8, 2021, Wong and Colleague 1 met in person over dinner in a restaurant in San Jose, California.

71. As Wong has testified, Wong and Colleague 1 discussed Lumentum's upcoming acquisition and its three likely targets, including NeoPhotonics, during their dinner.

72. Around the time of this dinner meeting on October 8, 2021, Wong sent a text message to Colleague 1, which Wong subsequently deleted.

11

73. On October 18, 2021, Wong told Colleague 3 in a text that one could obtain information on mergers and acquisitions (often called "M&A") by looking through Lumentum's internal email distribution groups to find out which people were working on M&A negotiations:

> Wong: [A]nother way to see about M&A is to see which email groups people are added to. Look up any person on [O]utlook and right click to see the email groups.

74. As Wong has testified, he understood that Lumentum used code names for M&A projects and related email distribution groups to mask the identity of potential deals and targets in order to safeguard the confidentiality of information regarding its M&A activity.

75. As Wong has testified, he understood that Lumentum was doing this to protect its information from being misused and to prevent leaks about its potential M&A activity.

76. On October 21, 2021, Wong and Colleague 2 texted about the possibility that Lumentum would imminently announce an acquisition. Wong suggested to Colleague 2 that NeoPhotonics might be Lumentum's acquisition target:

> Colleague 2: Something would be announced within two weeks. Do you know?
> Wong: No
> Colleague 2: M&A
> Wong: ?.
> Colleague 2: Likely
> Wong: Maybe [I]nfinera? [another company in the photonics industry]
> …
> Wong: Or [NeoPhotonics]?
> ...
> Colleague 2: Two weeks is earning time and it should be then[.]
> Wong: Or [NeoPhotonics]?
> Colleague 2: I don't know[.]
> Wong: Really?
> Colleague 2: Within two weeks something would happen[.]

**VII.   Wong Obtains Material Nonpublic Information About Lumentum's Acquisition of NeoPhotonics from Colleague 1 and Buys NeoPhotonics Stock**

    **A.   Colleague 1's Supervisor Informs Her of the Planned NeoPhotonics Acquisition**

77.   On approximately October 12, 2021—about a week after NeoPhotonics's Board of Directors confidentially approved Lumentum's offer to acquire NeoPhotonics at $16.00 per share, as alleged above in paragraph 61—Colleague 1's supervisor informed her that Lumentum and NeoPhotonics had resumed their acquisition discussions and that Colleague 1 could be asked to participate in the due diligence process again in the near future.

78.   On October 13, 2021, Colleague 1 purchased 350 shares of NeoPhotonics in her personal brokerage account at the price of $9.12 per share.

79.   On October 14, 2021, Colleague 1's supervisor confirmed to senior members of Lumentum's deal team by email that Colleague 1 was "in the know" on Lumentum's discussions with NeoPhotonics and would support other team members on the NeoPhotonics deal.

80.   Between October 15 and November 1, 2021, Colleague 1 purchased 11,730 additional shares of NeoPhotonics in her personal brokerage account at an average price of $9.80 per share.

    **B.   Wong Obtains Material Nonpublic Information about Lumentum's Plans to Acquire NeoPhotonics and Trades on the Information**

81.   On October 27, 2021, at 12:28 p.m., Wong and Colleague 1 spoke on the phone for approximately eight minutes.[1]

82.   The next day, on October 28, 2021, Wong purchased 10,000 shares of NeoPhotonics's stock at approximately $9.73 per share in his self-directed brokerage account.

83.   Before October 28, 2021, Wong had never traded NeoPhotonics's securities.

---

[1]   All times alleged herein are in Pacific Time.

84. Before October 28, 2021, Wong had never traded the securities of any other company in the photonics industry except Lumentum, his employer.

85. On October 29, 2021, Wong texted Colleague 2 that Lumentum was going to acquire NeoPhotonics:

> Wong:  It seems like [Lumentum's] acquisition of Neo is concern.
> Colleague 2:  Do you mean go or not go?
> Wong:  Go.
> Colleague 2:  Ok[.]
> . . .
> Wong:  They cancelled the sales training on Monday. I think announcement will come out Monday [November 1, 2021].

## VIII.  Lumentum Announces Its Acquisition of NeoPhotonics

86. On November 3, 2021, the day before Lumentum made its announcement, the price of NeoPhotonics stock closed at $11.52 per share.

87. On the morning of November 4, 2021, before the market opened, Lumentum issued a press release announcing that it had entered into a definitive agreement to acquire NeoPhotonics for $16.00 per share in cash—in other words, holders of NeoPhotonics stock on the date that the acquisition closed would receive $16.00 per share.

88. On November 4, 2021, following Lumentum's announcement, the price of NeoPhotonics stock closed at $15.99 per share, an increase of approximately 38.8% from its closing price on the previous day.

89. That day, as measured by the closing price of the stock, the NeoPhotonics stock Wong had purchased on October 28, 2021, was worth $62,573.73 more than the price he had paid to purchase the shares.

90. Later, Wong asked Colleague 2, who was on the NeoPhotonics deal's transition team, more than once for information about when the NeoPhotonics deal was likely to close.

### IX.     Wong Takes Steps to Conceal His Insider Trading

91.     On the morning of March 31, 2022, FBI agents approached Wong at his residence.

92.     The FBI agents questioned Wong about his trading in NeoPhotonics and his communications with Colleague 1.

93.     Wong falsely claimed to the FBI agents that the timing of his trading in NeoPhotonics just days before Lumentum announced its acquisition of NeoPhotonics was coincidental and that he did not know about Lumentum's planned acquisition of NeoPhotonics before the public announcement.

94.     Later that same morning, between 11:24 a.m. and 11:37 a.m., Wong texted Colleague 1 and asked to meet her in person that day at a Starbucks coffee shop:

> Wong:  Can u meet today?
> Wong:  Maybe at 1:30?
> Colleague 1:  Where to meet? [. . .]
> Wong:  Near my place – maybe near rose orchard?
> Colleague 1:  Okey [sic] pls let me know the address.  I will rush in[.]
> Colleague 1:  It is just for us pls[?]
> Wong:  Yes[.]
> Wong:  Starbucks
>            In River View Apartment Homes
>            0.5 mi 55 River Oaks Pl
> Wong:  Can we meet there at 12:45 PM?
> Wong:  Is that ok?
> Colleague 1:  Okey [sic] see you soon[.]

95.     As Wong has testified, he and Colleague 1 met as planned at approximately 12:45 p.m. that day.

96.     As Wong has testified, at this meeting, he and Colleague 1 discussed the FBI approach and Lumentum's ongoing investigation into Colleague 1's trading in NeoPhotonics securities.

97. As Wong has testified, he and Colleague 1 then sent text messages to each other falsely indicating that they had not met, as alleged in paragraphs 98 and 99 below, in an "attempt to kind of cover [their] tracks."

98. On March 31, 2022, at 1:30 p.m.—minutes after their in-person meeting—Wong sent the following false text messages to Colleague 1:

> Wong:  Sorry I couldn't find you[.]
> Wong:  I have to leave now.

99. A few minutes later, at 1:48 p.m., Colleague 1 falsely replied: "Okey [sic] never mind. We can always plan when you are in the town."

100. Subsequently, in April 2022, Wong and Colleague 1 continued communicating about the ongoing investigations into their trading in NeoPhotonics but looked for alternative communication channels, including WeChat, to evade detection and surveillance.

101. On April 2, 2022, Wong and Colleague 1 had the following text message exchange:

> Wong:  Hi [Colleague 1] – can you call me [ ] at my home number this afternoon. If this is ok, I'll provide[.]
> Colleague 1:  Sure, we can talk. As a head[s]up, [d]ue to my current leave situation, I can only talk non-work related and other general stuff, thanks for your understanding[.]
> Wong:  Sure[,] absolutely. I just want to discuss general aspects[.] [Please] let me know the number and appropriate time slot to phone you[,]
> Colleague 1:  Oh, you are in Canada. It will be international call. Maybe better go with WeChat to save money:)
> Wong:  Actually I may be on the road – can you call me on WeChat?
> Wong:  Oh yes!

102. As he has testified, Wong's suggestion to communicate via WeChat was an attempt to evade detection; he and Colleague 1 did not want to speak on a line that might be recorded.

103. As Wong has further testified, he and Colleague 1 subsequently communicated via WeChat on the subject of Wong hiring an attorney in connection with the law enforcement investigation into his trading.

## X.   Lumentum Closes Its Acquisition of NeoPhotonics

104. On August 3, 2022, Lumentum announced the completion of its acquisition of NeoPhotonics, which became a wholly-owned subsidiary of Lumentum.

105. On August 4, 2022, NeoPhotonics shareholders, including Wong, received $16.00 per share from Lumentum.

106. Following the acquisition, NeoPhotonics stock ceased trading and was delisted from the New York Stock Exchange.

107. Wong's employment at Lumentum ended on or around December 9, 2022.

## CLAIM FOR RELIEF

**Violations of Exchange Act Section 10(b) and Rule 10b-5 Thereunder**

108. The Commission re-alleges and incorporates by reference here the allegations in paragraphs 1 through 107.

109. By engaging in the conduct described above, Wong, directly or indirectly, in connection with the purchase or sale of securities and by the use of means or instrumentalities of interstate commerce, or the mails, or the facilities of a national securities exchange, knowingly or recklessly has (i) employed one or more devices, schemes, or artifices to defraud, (ii) made one or more untrue statements of a material fact or omitted to state one or more material facts

necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading, and/or (iii) engaged in one or more acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

110. By reason of the foregoing, Wong, directly or indirectly, has violated and, unless enjoined, will again violate Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## **PRAYER FOR RELIEF**

WHEREFORE, the Commission respectfully requests that this Court enter a Final Judgment:

**I.**

Permanently restraining and enjoining Wong and his agents, servants, employees and attorneys and all persons in active concert or participation with any of them from violating, directly or indirectly, Exchange Act Section 10(b) [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5];

**II.**

Ordering Wong to disgorge all ill-gotten gains he received directly or indirectly, with pre-judgment interest thereon, as a result of the alleged violations pursuant to Exchange Act Sections 21(d)(3), 21(d)(5) and 21(d)(7) [15 U.S.C. §§ 78u(d)(3), 78u(d)(5) and 78u(d)(7)];

**III.**

Ordering Wong to pay civil monetary penalties under Exchange Act Section 21A [15 U.S.C. § 78u-1];

**IV.**

Prohibiting Wong from serving as an officer or director of any company that has a class

of securities registered under Exchange Act Section 12 [15 U.S.C. § 78l] or that is required to file reports under Exchange Act Section 15(d) [15 U.S.C. § 78o(d)], pursuant to Securities Act Section 20(e) [15 U.S.C. § 77t(e)] and Exchange Act Section 21(d)(2) [15 U.S.C. § 78u(d)(2)]; and

**V.**

Granting any other and further relief this Court may deem just and proper.

Dated: New York, New York
June 3, 2024

/s/ Sushila Rao Pentapati
Joseph G. Sansone
Preethi Krishnamurthy
Lindsay S. Moilanen
Sushila Rao Pentapati
Joshua R. Geller
Securities and Exchange Commission
New York Regional Office
100 Pearl Street, Suite 20-100
New York, NY 10004-2616
(212) 336-0410 (Rao Pentapati)
Email: pentapatisu@sec.gov

*Attorneys for Plaintiff*